UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE | * | DOCKET NUMBER |
| | * | |
| **NICHOLAS P. PERICONE** | * | **05-17699** |
| DEBTOR | * | CHAPTER 7 |

## REASONS FOR ORDER

On September 23, 2005, Nicholas P. Pericone ("Debtor") filed a voluntary petition for relief under Title 11, Chapter 7 of the United States Bankruptcy Code ("Code"). Daniel A. Smith was appointed trustee ("Trustee") on October 19, 2005.[1]

On April 30, 2007, Trustee filed an Application for Order Approving Employment of Counsel ("Employment Application").[2] The Employment Application was granted on April 30, 2007 ("Employment Order"). The Employment Order authorized Daniel A. Smith and the law firm of Healy & Smith APLC ("Firm") to bring actions on behalf of Trustee "with regard to all matters requiring the advice, counsel, and representation by legal counsel during the administration of the above estate including discovery and proceedings related to investigation of and recovery from the succession recently disclosed wherein the Debtor is an heir." The Employment Application called for a contingent fee of one third (1/3) of gross recovery and costs, subject to fee application.

On May 16, 2007, the Firm filed a Complaint for Turnover of Property ("Complaint") against Joseph Patrick Pericone, Jr., individually and as executor of the succession of Joseph Pericone, Sr.,

---

[1] P-3.

[2] P-27. Trustee's Certificate of Service attests that he served the Application on Debtor's counsel and Debtor on May 1, 2007. P-29. Because this Court granted the Employment Application on an *ex parte* basis on April 30, 2007, neither Debtor nor his attorney received notice of the Application before the Employment Order was executed. P-28.

1

John Paul Pericone and Christopher Pericone (collectively "Defendants").[3]   The Complaint demanded turnover of all pertinent information about the succession of Joseph Pericone, Sr. (the "Senior Pericone") and any property due to Debtor.   Trustee eventually settled the matter with Defendants for a cash payment of $75,000.00.  The Court approved the Motion for Authority to Compromise Claims and to Sell Undivided Interest in Real Estate ("Motion to Compromise") on September 19, 2007.[4]

On September 5, 2007, about one month after Trustee filed his Motion to Compromise,[5] Debtor filed a Motion to Reconsider[6] the appointment of the Firm as attorney for Trustee ("Motion for New Trial").[7]  On October 26, 2007, the Firm filed an Application for Compensation.[8]  Debtor's Motion for New Trial was denied on November 27, 2007,[9] and the Firm's Application for Compensation ("Compensation Application")  was granted on December 5, 2007.[10]   Debtor appealed both rulings to the United States District Court for the Eastern District of Louisiana ("District Court").

---

[3] AP 07-01058, P-1.

[4] P-60.

[5] The Motion to Compromise was filed on August 2, 2007. P-42.

[6] The Motion to Reconsider was considered as a motion for new trial under Rule 60.

[7] P-48,49.  Debtor did not set the Motion was set for hearing until October 17, 2007, following a Supplemental Motion to Reconsider. P-63.

[8] P-67.

[9] P-81.

[10] P-83.

On October 21, 2008, the District Court reversed the denial of the Motion for New Trial. It remanded for reconsideration in light of Trustee's failure to properly serve Debtor.   The District Court also vacated the Compensation Order in light of the existing remand on the Motion for New Trial.[11]   On remand, Debtor's Motion for New Trial was granted.  A new trial on the Employment Application and Compensation Application (collectively referred to as "Applications")  was held on July 21, 2009.   After submission of post-trial briefs, the Applications were taken under advisement.

### FACTS

Initially, Trustee gathered what he believed to be the estate's only assets based on information provided by Debtor under penalty of perjury.   Trustee filed his Final Report and Account after all assets had been reduced to cash and distributed to creditors.[12]  The Court approved Trustee's Final Report and Account on October 13, 2006.[13]  Debtor was discharged on March 31, 2006.[14]  Believing that all administrative duties prescribed by the Code had been performed, Trustee filed his Report of Distribution and Application for Closing and Discharge on December 29, 2006.[15]  The Case was closed on January 4, 2007.   The holders of $51,229.07 in unsecured claims received a distribution of less than three percent or $1,352.10.

In January 2007, Trustee was contacted by Jeffery Oakes ("Oakes"), counsel for the Senior Pericone's succession.  Oakes advised Trustee that Debtor's father had died and that he wanted to

---

[11] P-135.

[12] P-13.

[13] P-17.

[14] P-10.

[15] P-20.

negotiate a release of any claims held by Trustee against the succession.  On February 21, 2007, Trustee filed a Motion to Reopen the bankruptcy proceeding to administer any claims the bankruptcy estate held against the succession.[16]

After speaking with Oakes in January 2007, Trustee spent several months making informal requests for information necessary to determine the value of the Senior Pericone's estate.  The requests were directed to Debtor and Oakes.  On April 30, 2007,  Trustee made a formal written demand for the requested information on Oakes.[17]

By email dated May 9, 2007, Michael Britt ("Britt"), Debtor's counsel, provided Trustee with the Senior Pericone's name, the name of his executor, and the names of Debtor's three siblings; however, he failed to provide contact information for the siblings or executor.  Britt represented that he had no information regarding the succession or its assets, but confirmed that Brice Jones ("Jones") and Oakes were handling the Senior Pericone's estate.[18]   Britt advised he had been unsuccessful in contacting Jones and Oakes, but represented that one of them would contact Trustee with additional information regarding the succession.   Thereafter, neither Oakes nor Jones contacted Trustee, and no one provided additional information.

Faced with the inability to informally gather information about the succession and the value of Debtor's interest from Debtor, his siblings or the various lawyers involved in this matter, Trustee filed a Motion for Turnover ("Turnover Motion") against Debtor on May 15, 2007.[19]  The Turnover

---

[16] P-21.

[17] Exhibit 9.

[18] Exhibit 11.

[19] P-30.

Motion represented that Debtor had failed to provide information about the succession, its representatives and potential heirs.  Debtor responded to the Turnover Motion by providing contact information for his siblings and the executor to Trustee.[20]  Trustee then withdrew the Turnover Motion.[21]  Trustee next filed the Employment Application.  After the Employment Order was signed, the Firm filed an adversary proceeding against Debtor's siblings and the executor of Debtor's father's estate.[22]  The Complaint, dated May 16, 2007, requested turnover of all property belonging to the bankruptcy estate.[23]

Defendants filed an Answer to the Complaint on June 28, 2007. [24]  In their Answer, they pled that "subsequent to the filing of . . . [Debtor's bankruptcy ] . . . petition, the decedent donated all right, title and interest in and to certain immovables, one located in Louisiana and the other in Colorado, that as a result of the Donation, those assets, specifically should be excluded from the bankruptcy estate." The Defendants further denied that any asset in which they had an interest should be "turned over" as they were not parties to the bankruptcy proceedings.

Defendants' Answer was based in part on an Act of Donation ("Donation") executed by Debtor's sister-in-law under a power of attorney granted to her by the Senior Pericone.[25]  The Donation purported to transfer the Senior Pericone's interest in the family home ("Home") and

---

[20] Exhibit 12.

[21] P-34, 35.

[22] AP 07-1058.

[23]  While the adversary proceeding was pending, Trustee filed a second turnover motion against Debtor for proceeds received from his mother's succession. P-39.  Subsequent to the initial closure of Debtor's case, the family home was sold, and Debtor received $4,651.03 in partial satisfaction of his interest in his mother's estate.

[24] AP 07-01058, P-10.

[25] Exhibits 3,13.

Colorado property to Debtor and his three siblings in equal shares. The Donation was contrary to the terms of the Senior Pericone's will, which bequeathed his entire interest in the Home and its furnishings to Debtor.[26] The evidence was conflicting as to whether or not the Donation was executed prior or subsequent to the death of the Senior Pericone, and the Court makes no finding on this point. However, based on the will of Debtor's mother and the sworn description list of her succession's assets, the Court finds that at the time Debtor filed his petition for relief, he was entitled to a one-eighth (1/8) interest in her estate.[27] The Court further finds that her estate included a one-half (1/2) interest in immovable property located in Colorado, Home, as well as various stocks, bonds, jewelry, and other valuable movables.

A pretrial conference in the adversary proceeding was held on July 16, 2007. At the conference, Jones admitted that the heirs were unwilling to acquiesce to Trustee's claims and that despite the legal veracity of Trustee's position, Defendants were unmoved. Without their authorization, Jones represented that had no choice but to contest the Complaint. Ultimately, Jones convinced his clients of the wisdom of settlement. He and the Firm negotiated a release of all claims against the succession for a cash payment of $75,000.00. This amount was just enough to pay all administrative claims in full and most of the unsecured claims.

On September 19, 2007, the Court entered an Order Granting Compromise and to Sell Undivided Property.[28] Under the terms of the compromise, the bankruptcy estate received $75,000.00 in cash and released all claims it might hold against the Senior Pericone's succession,

---

[26] Exhibit 4.

[27] Exhibit 13. The Debtor's mother died in 1997, but the succession was not opened until 2005.

[28] P-60.

6

the executor, Debtor's siblings, and any property acquired by Debtor whether by donation *inter vivos*

or *mortis causa* from his father.[29]

Debtor now objects to the employment of the Firm for the purpose of instituting the

adversary proceeding against the Defendants.  Alternatively, if the Firm's employment is approved,

Debtor also objects to compensating the Firm in any amount.

## LAW AND ANALYSIS

### A.    The Legal Standard for Employment Of Counsel

A trustee must meet certain qualifications, which do not include being a licensed attorney,

in order to be appointed.[30]  Trustees perform administrative duties in every Chapter 7 bankruptcy.[31]

---

[29] P-42,60.

[30] Title 28 of the Code of Federal Regulations at Part 58 (28 C.F.R. Part 58.3) sets forth the minimum qualifications for appointment:

...(6)(i) Be a member in good standing of the bar of the highest court of a state or of the District of Columbia; *or*

(ii) Be a certified public accountant; *or*

(iii) Hold a bachelor's degree from a full four-year course of study (or the equivalent) of an accredited college or university ...; *or*

(iv) Be a senior law student or candidate for a master's degree in business administration.., *or*

(v) Have equivalent experience as deemed acceptable by the U.S. Trustee....

(emphasis added).

[31] 11 U.S.C. §704 charges the trustee with the following duties:  collect and reduce to money the property of the estate for which such trustee serves; close such estate as expeditiously as is compatible with the best interests of parties in interest; be accountable for all property received; ensure that the debtor shall perform his intention as specified in section 521(2)(b) of this title; investigate the financial affairs of the debtor; if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper; if advisable, oppose the discharge of the debtor; unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest; if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and make a final report and file a final account of the administration of the estate with the court and with the United States trustee.  11 U.S.C.§ 704(a).

For example, trustees locate, gather and liquidate a debtor's nonexempt property and make distributions to creditors from the proceeds received.  Chapter 7 trustees are paid for performing their administrative duties pursuant to the Code's strict compensation schedule.[32]

When a case requires action beyond mere administration, section 327 of the Code authorizes the trustee to employ counsel to assist him in the performance of his duties.  When seeking to retain counsel, the threshold question becomes whether the services to be performed are those "which one not licensed to practice law could properly perform for another for compensation."[33]  If a nonlawyer could not perform the services for compensation, then engagement of counsel is appropriate.

A trustee who seeks to employ himself or his law firm must also show that his retention is in the best interest of the estate.[34]   In order to meet that burden, the trustee must apprise the court of the facts necessitating employment.  That information will in turn be considered in determining if the proposed employment is in the estate's best interest.

Lawyers hired to represent trustees are entitled to compensation subject to the following limitations as set forth in 11 U.S.C. §328(a):

> (a)    The trustee, . . . with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including *on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis*. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the

---

[32]  *See*, 11 U.S.C. §726(a).

[33]  *In re Castro*, 320 B.R. 690, 696 (S.D. Calif., 2005) (citation omitted).

[34]  11 U.S.C. § 327(d).

8

fixing of such terms and conditions.

(emphasis added).

The Code specifically authorizes the employment of a trustee's own law firm, upon court approval, notwithstanding the fact that a trustee stands to personally profit from the appointment.[35] The Code places the following compensation restrictions on trustees who hire their law firms to act as legal counsel for the estate:

> b)    If the court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant *only to the extent that the trustee performed services as attorney or accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.*[36]

1.    <u>A Bankruptcy Estate May Not Be Represented By Nonlawyers In Litigation</u>

Trustee  requested employment of the Firm for the purpose of drafting and prosecuting a complaint against Defendants.  The threshold issues for consideration are:  1) whether the hiring of a lawyer was necessary for this purpose; and 2) whether employment of the Firm was in the best interest of the estate.  Debtor asserts that employment of the Firm was unnecessary.  Alternatively, if employment of counsel was necessary, Debtor argues that the Firm should not have been hired and in any event, the Firm should not be compensated for any legal work performed.

---

[35]  Bankruptcy Rule 2014(6) states that when an attorney or law firm is employed, any member or regular associate of the partnership, corporation or individual may act as attorney so employed without further order of the court.  Furthermore, Bankruptcy Rule 2016(a) allows for the sharing of fees among attorneys who practice in the same law firm, without disclosure to the court, allowing trustees to enjoy an economic benefit from such employment.

[36]  11 U.S.C. §328(b) (emphasis added).

9

The institution of litigation for another is not a mere administrative or ministerial act.  It requires the use of specialized skill and experience which only a lawyer may provide.  For this reason, a nonlawyer may not file a complaint on behalf of another with or without compensation.[37] A trustee is a representative of the bankruptcy estate, an entity separate and apart from the debtor and trustee.  Strictly viewed, counsel for a trustee is employed to represent the bankruptcy estate's interests, not the personal interests of the trustee.  As such, the employment of trustee's counsel is not the employment of counsel *for the trustee in his individual capacity, but for the trustee as the representative of the bankruptcy estate.*  Therefore, even when the trustee seeks employment of himself as counsel for himself in his capacity as trustee, his client is *the bankruptcy estate*.  Because the litigation is asserted on behalf of another, it may not be brought by a nonlawyer, for to do so would constitute the unauthorized practice of law.  For these reasons, the Court holds that the institution of litigation is not conduct that falls within the administrative duties of trustees.

Debtor next argues that employment of the Firm was unnecessary because the succession offered to pay the bankruptcy estate $25,000.00 in full settlement of its claims.  Debtor also argues that the matter could have been negotiated between the succession and Trustee without the need for litigation.  Unfortunately, Debtor's arguments ignore the facts of this case.

2.  <u>The Institution of An Adversary Proceeding Was Necessary To Recover Property Of The Estate</u>

The issues presented in the Complaint stem from the fact that neither Debtor nor his siblings fulfilled their duties under the Bankruptcy Code to account for and turn over all property belonging to Debtor.  A voluntary turnover of all information regarding the successions along with an

---

[37] La. R.S. 37:213 and Rule 5.5 of the Louisiana Rules of Professional Conduct.

assessment of the full value of Debtor's interest in both parents' successions would have obviated the need to bring the Complaint against Defendants. As the case unfolded, none of Defendants, their counsel nor Debtor cooperated with Trustee by providing accurate information or negotiating in good faith prior to the institution of the adversary proceeding.

Facts Involved in the Adversary Proceeding

Debtor's mother died eight years prior to the filing of this case. No succession was open for her estate on the Petition date. Nevertheless, when Debtor filed for bankruptcy relief, he was already *in seizin* of his interest in his mother's succession estate.[38] Debtor's right to this inheritance was neither disclosed in his Schedules, Statement of Financial Affairs ("SOFA"), nor to Trustee at the meeting of creditors.[39] Under the terms of his mother's will, Debtor inherited a one-eighth (1/8) interest in her estate. This inheritance was subject to a usufruct in favor of Debtor's father. Because these facts were not disclosed, Trustee was not put on notice as to Debtor's existing interest in his mother's former property, including the Home.

Shortly after Debtor filed for relief, a succession was opened on behalf of his mother's estate and under a Judgment of Possession dated December 7, 2005, Debtor received a one-eighth (1/8) interest in his mother's estate. Debtor's father died one month after Debtor filed for relief.

Debtor's meeting of creditor's pursuant to 11 U.S.C. §341(a) of the Code was conducted in January 2006, three (3) months after Debtor's Petition was filed and two (2) months after the Senior

---

[38] Debtor's interest in the mother's estate vested upon her death and was an interest in property that required disclosure in the bankruptcy case. La. C.C. Art. 935

[39] Debtor's mother died in 1997. In addition to the Home, the sworn descriptive list filed in her succession itemized real estate in Colorado, jewelry, silver, china and other decorative items, savings bonds, cash deposits and household furnishings. Given the fact that the mother's succession had not been opened prior to Debtor's bankruptcy filing and that the mother had died eight years earlier, the Court accepts for purposes of these Reasons that Debtor was unaware of his right to inherit from his mother's estate. This understanding is based on the limited information presented at the hearing on this matter.

Pericone had died. Despite being required to disclose any potential or existing rights of inheritance existing on the date of filing, and any acquired within one hundred eighty (180) days after filing, Debtor said nothing to Trustee about either his mother or father's deaths or estates.[40] This was a significant omission given that the Senior Pericone's will granted Debtor the entire ownership interest in his parents' Home, a one-fourth(1/4) interest in all other assets held by the Senior Perricone, and Debtor had just one month prior, acquired a one-eighth (1/8) interest in the assets of his mother's estate.[41]

Although Debtor argues that negotiation with the succession could have avoided litigation, Debtor and Defendants failed to negotiate or cooperate with Trustee prior to the institution of suit. Trustee testified, and the record reflects, that his attempts to informally obtain information from Debtor, the heirs and succession counsel regarding the value of Debtor's interest in the succession were unsuccessful. Of course, Defendants, Debtor, Oakes, Jones, and Britt also studiously avoided alerting Trustee to Debtor's rights in his mother's estate or the Judgment of Possession.

The only information provided to Trustee before the Firm was hired was Oakes' valuation of the Senior Pericone's succession at approximately $200,000.00 and his suggestion that Trustee settle for a $25,000.00 cash payment. Without the requested information, Trustee could not determine the extent of Debtor's interest in any of the succession property, the value thereof, and the reasonableness of settling the matter for $25,000.00. Because $25,000.00 was insufficient to

---

[40] 11 U.S.C. 541§ (a)(5)(A) of the Code states that the bankruptcy estate includes "any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that debtor acquires or becomes entitled to acquire within 180 days after such date– (A) by bequest, devise, or inheritance;..." Schedule B of the bankruptcy petition requires debtors to divulge information about the debtor's "contingent and non-contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust."

[41] Exhibit 4.

fully satisfy all claims against Debtor, Trustee had an obligation to investigate the bankruptcy estate's rights.

Even after suit was filed, Oakes was at best recalcitrant about providing Trustee with the facts necessary to properly understand or evaluate the bankruptcy estate's claims. In its worst light, Oakes engaged in misdirection and deception. In a letter to Trustee dated May 22, 2007, Oakes forwarded some, but not all, the information requested by Trustee. Although the letter answered some of Trustee's questions, it also neglected to provide critical pieces of information essential to Trustee's evaluation of the bankruptcy estate's rights.[42] For example, Oakes represented the value

---

[42] Exhibit 13. For purposes of these Reasons, a determination as to the veracity of the allegations regarding Debtor or his siblings' attempts to hide assets is unnecessary. Nevertheless, the allegations are instructive with regard to the complexity of the issues raised by this case, the need for legal counsel to evaluate the causes of action available to the estate, as well as their cost and probability for success. The information omitted by Oakes in his letter to Trustee included:

1. The copy of Mrs. Pericone's Sworn Descriptive List was not complete. The itemization of community property begins at the bottom of page one. Item One identified lot 292 in Westchester Estates, St. Tammany Parish. The rest of the property description was not copied, nor was its value. Page 2 begins with the numeral 4, indicating that in addition to the omission of Lot 292's value and legal description, two other assets were not disclosed.

2. Failure to identify the date of the Senior Pericone's death or provide a death certificate. Oakes' failure to reveal the Senior Pericone's date of death concealed a fact necessary to evaluate the strength of Oakes' claim that the Senior Pericone's interest in the Home had been donated to Debtor postpetition, not acquired by inheritance. The date of the Senior Pericone's death would have allowed Trustee to evaluate potential causes of action challenging the Donation. Testimony provided at trial indicated that the Senior Pericone died *before* the Donation was executed. If true, the Donation would have been void. The inclusion of the asset in the Senior Pericone's succession, the state court order granting permission to sell, and the succession's appearance at the Act of Sale for the Home in January 2007 support the conclusion that the Donation was void. These facts were known to Oakes. If Oakes truly believed that the Donation was enforceable, the Home would not have been included in the succession, no state order would have been necessary to sell, and the succession would not have appeared as a seller in January 2007. The Court can only surmise that Oakes purposefully omitted the Act of Sale for the Home, relevant succession pleadings, Senior Pericone will and death certificate in order to protect his asserted position.

3. Failure to disclose that the Home had been sold and that a portion of the sale funds had been distributed to Debtor in January 2007.

4. Oakes did reveal a flood and wind damage claim in favor of the succession but even this revelation suppressed another claim held by Trustee. As a result of Hurricane Katrina, an insurance payment of $170,058.69 was delivered to the succession.

of Debtor's interest in his father's estate to be no more than $50,000.00.  He also represented that this figure included any interest Debtor might have in his mother's estate.[43]  Oakes neglected to disclose that the Home had already been sold for $78,000.00 and that under the terms of the Senior Pericone's will, Debtor was to inherit its entire value.  The Senior Pericone's will was not provided.

Although the Sworn Descriptive List from Mrs. Pericones's succession indicates significant jewelry and other valuables were owned by Mrs. Pericone, Oakes' letter states, "many of the household goods in which he inherited a share were damaged or destroyed by Hurricane Katrina, and are now of little or no worth, although their pre-hurricane value was used in calculated the $50,000.00 value above."[44]  Oakes failed to note that the Senior Pericone's estate had received a check for $170,058.69 for damages to the Home and contents.[45]

Oakes also carefully avoided disclosing the value of the Colorado real estate.  In his cover letter he indicates a value of $$22,830.00.  This was based on its tax assessed value, not its fair market value.  No mention is made of various stocks and bonds owned by the Pericones.[46]

Although they did not represent Debtor or any of the heirs, the attorneys for the succession asserted multiple defenses and legal challenges to Trustee's claims in their May 22, 2007, response.

---

[43]  *Id.*

[44]  *Id.*

[45]  Oakes did enclose a letter from Jones to the exeuctor outlining the division of an insurance payment between the succession and Debtor's sibling.  It is not clear from the letter if the insurance claim included contents inherited by Debtor.

[46]  Exhibit 13.

Debtor's counsel was copied on the correspondence but made no effort to correct what can only be described as an act of misinformation and misdirection.[47]

Trustee was stonewalled when he would not settle his claims against the succession for $25,000.00 unless and until he was provided additional information. When Trustee's informal attempts to get the information proved fruitless, Trustee determined that his only viable option was to bring suit against Debtor's siblings. The Court concludes that the adversary proceeding would have been unnecessary had Debtor and his siblings promptly provided detailed and complete information regarding the composition of the estates, copies of the death certificates and wills, and the Affidavits of Death, Domicile and Heirship required under Louisiana law. Because none of this information was provided, Trustee would have breached his duty to the bankruptcy estate and creditors *if he had not authorized* the adversary proceeding and had merely settled the estate's claims for $25,000.00, a sum insufficient to pay creditors in full.

Debtor claims that Trustee should not have been allowed to hire counsel because *he* did not withhold information. The Court is not sufficiently certain of this assertion. Debtor's represented to Trustee that he had no information on the successions, even after receiving a cash distribution from his mother's estate just months prior. In addition, Debtor failed to bring any of his misconduct, or charitably "mistakes," to light on his own. The Court notes that Debtor holds two PhD degrees, including one in business, yet he professed no understanding as to the effect of any of his actions including the execution of a Donation, the inheritance from his mother by Judgment of Possession, the effect of his father's death, will, or his right to an inheritance. The Court does not find this

---

[47] *Id.*

testimony credible.  Nevertheless, it is unnecessary for purposes of these Reasons, to decide whether or not Debtor actively sought to conceal assets from Trustee.

Whether or not Debtor was to blame does not change the fact that Debtor's bankruptcy estate included assets inherited from his parents, and Trustee had a duty to properly administer them. Whether or not Debtor lied does not change the fact that Debtor was unwilling or unable to supply the information necessary to evaluate the inherited assets and claims against the successions, executors and heirs.  Whether or not Debtor perjured himself does not change the fact that Debtor's siblings stonewalled Trustee for months by providing little, or worse, misleading, information about the successions.

After considering the merits of the Employment Application, Debtor's Objection thereto, the arguments of counsel and the evidence presented at trial,  the Court concludes that the employment of counsel by Trustee to bring the Complaint was necessary to assist Trustee in carrying out his duties.

### B.      Employment of Trustee's Firm as Counsel

Having established the necessity of retaining legal counsel to represent the Trustee, the Court now turns to whether Trustee's firm should be retained *in lieu* of outside counsel.  Although a trustee is held to a high standard when seeking to appoint himself or his law firm as counsel for the estate, he is not barred from doing so.[48]  The employment of a trustee's own law firm generally will be in the best interest of the estate in four non-exclusive situations:   1) the estate assets are principally composed of unliquidated causes of action, there are few assets with which to pay outside legal counsel, and trustee or his firm is employed on a contingency fee basis; 2) the estate

---

[48] *In re Dergance*, 218 B.R. 436, 438 (N.D. Ill. 1998).

16

requires such little legal work, that the effort and expense of hiring an outside law firm is not warranted; 3) substantial legal activity must be performed quickly,  precluding the employment of outside counsel unfamiliar with the situation; or 4) the trustee demonstrates that the appointment of his own law firm will result in substantial reduction of costs to the estate.[49]

### 1. Debtor's Estate was Principally Composed Of Unliquidated Causes of Action And The Firm Was Initially Retained On A Contingency Fee Basis

When this case was reopened, Debtor's estate contained no assets save the causes of action described above against Defendants and the parents' successions.  The estate had no money to retain counsel or to pay the costs of investigation or litigation.  As recited above, neither Debtor, his siblings, nor their counsel fully cooperated with Trustee in the investigation or liquidation of these claims.

Debtor asserts that the Firm knew when it filed the Complaint that the estate would ultimately receive some funds from the successions.  The Court recognizes that there was some discussion about settling for $25,000.00 prior to filing the Complaint.   But the Court has also found that the succession representatives were uncooperative in providing Trustee with sufficient information to evaluate that offer.  Given that the $25,000.00 was insufficient to satisfy claims in full, Trustee would have breached his duty to creditors had he settled without obtaining the information necessary to properly evaluate the offer.  Thus whether or not the offer was fair, and it was not, Trustee was compelled to proceed to litigation due entirely to the lack of cooperation and candor exhibited by Debtor, Defendants, and their counsel.

---

[49] *In re Butler Industries*, 101 B.R. 194, 197 (Bankr. C.D. Cal. 1989).

Further, given the lack of basic cooperation by Debtor and Defendants, Trustee had no basis with which to evaluate the cost of litigation or the difficulty of collection.  These intangibles made the certainty of assets to pay fees and costs anything but absolute.

> 2.  Employment of The Firm Brought Potential Substantial Savings To The Estate

Absent recovery from the successions, the bankruptcy estate had no assets with which to pay attorney's fees; therefore, employment of outside counsel was improbable. Trustee testified  that in his experience, outside counsel are reluctant, if not opposed, to work for an hourly rate if there are no assets to pay for their services.   The Court finds this testimony credible as it mirrors the Court's experience.

In contexts other than bankruptcy, attorneys compensated by the hour are entitled to payment regardless of whether or not they secure a successful resolution of a client's problem.  They are also entitled to payment on an ongoing or interim basis during the representation.  Bankruptcy counsel are typically compensated on an hourly basis as well.  During the representation, bankruptcy counsel also apply to the Court for interim payments on fees and costs incurred.  However, based on the thousands of requests for appointment and for compensation filed with this Court every year, very few involve employment of counsel on an hourly basis when the bankruptcy estate has no visible means to pay.

If no assets exist with which to pay counsel, a few firms will represent bankruptcy estates on a contingency fee basis.  Most often this occurs in the personal injury context.  Trustee testified that in his experience, outside counsel are reluctant to represent a bankruptcy estate in a commercial matter on a contingency fee basis.  Of the firms  willing to represent a financially strapped estate in a commercial matter on a contingency fee basis, a smaller subset are willing to assume the

18

representation without some assurance that their costs can be reimbursed.  For those that do, the risk of nonpayment is balanced by the volume of work a trustee may supply to the firm over time.  At the time this case was reopened, Trustee had just retired from the panel of approved trustees and was winding down his files.  As such, he could not offer an outside firm additional representations as an inducement to retention in this case.

Debtor argues that at a minimum, the estate was "worth" $25,000.00 based on the tentative settlement offer by Oakes.  Debtor asserts that on the strength of this "fact" outside counsel could have been retained on an hourly basis.  While Trustee did receive a tentative settlement offer of $25,000.00, whether that offer was generous, fair, or minimal was unknown.  If generous or fair, counsel for the bankruptcy estate could only expect $8,333.00 (one third (1/3) of the amounts obtained) in payment for their services.  The multiple defenses to payment raised by Defendants prior to the institution of suit and after, the issues raised by the facts, and the lack of information critical to prosecution of the Complaint, made this matter complex and difficult and, more importantly, if the matter were not settled quickly, expensive to prosecute.  As evidenced by the Firm's invoices, the actual value for the time spent at hourly rates through the date of settlement was almost $14,000.00 and did not include a trial on the merits.

Because of these factors, Trustee believed that retention of an outside firm was not possible. Debtor did not refute this testimony, and the Court finds it credible.

The Court also finds that the appointment of Trustee's own law firm was in the estate's best interest.  Trustee testified that he held out some hope that the matter might be quickly settled even after the Complaint was filed.  In that event, the value of the legal services performed might actually be less than the value of the contingency award.  If the disparity was great and he was counsel of

record, Trustee testified that he was prepared to "back out" of the contingency fee arrangement in favor of an hourly fee, saving the estate unnecessary fees and expenses. However, if outside counsel were employed, Trustee believed that it would be difficult, if not impossible, to change the terms of employment if a quick settlement was negotiated. The Court also finds this testimony to be credible.

In a contingency contract, counsel risks no payment or underpayment based on the ultimate recovery obtained and the effort expended. Balanced against this risk is the possibility of overpayment. Such is the nature of a contingency arrangement. In this Court's experience, few lawyers, once retained on a contingency basis, are willing to voluntarily waive their right to a windfall contingent fee. Hindsight is 20-20 but it should not blind the Court to the real risks counsel embraced to represent the estate. The Firm's willingness to receive compensation on a contingency basis, or an hourly one if the matter concluded quickly, could have resulted in a substantial reduction of costs to the estate and was therefore advantageous.

In conclusion, this estate was principally comprised of unliquidated causes of action. Because there were no assets with which to pay for counsel, Trustee's firm agreed to represent the estate on a contingency basis. The Firm's employment as counsel provided an opportunity to waive compensation on a contingency fee basis if the adversary settled quickly. Finally, given the failure of disclosure and cooperation exhibited by Debtor, his counsel, Defendants and their counsel, retention of the Firm was both necessary and beneficial to the estate.

## COMPENSATION APPLICATION

The Compensation Application requests one third (1/3) of all amounts recovered, or $25,000.00, as its fee. Debtor objects to any compensation for the Firm whether based on a contingency fee or on an hourly rate. Notwithstanding the Firm's right to request payment of the

20

full $25,000.00 in attorney's fees or more, the Firm has offered to voluntarily reduce any fee award

by an amount necessary to pay all unsecured creditors in full.

When the initial hearing on the Compensation Application was held, the Firm had expended

fees of $13,875.00, based on hourly rates, in connection with the filing and prosecution of the

Complaint.[50] None of the invoices included fees or costs for time expended prior to the drafting of

the Complaint or for administrative duties of Trustee.  Although the services rendered on a hourly

basis were less than the amounts due under the contingency arrangement, this Court did not initially

reduce the Firm's fee request because it did not believe the facts supported a reduction.[51]

Based on the Firm's original authorizations of employment, the Court awarded a fee of

$25,000.00 or one third (1/3) of the recovery obtained.  After the Court's Employment Order granting

compensation, Debtor appealed.   The issues raised on appeal included a request to deny all

compensation to the Firm.  The matter was remanded for reconsideration of Debtor's Motion for New

Trial.  The remand did not affirm or reverse any issue on the merits, including the propriety of the

Firm's employment or the reasonableness of compensation.  Of course in granting Debtor's request

for new trial, this Court reconsidered all issues on the merits.

---

[50] Debtor's brief made much about the turnover motions brought against him individually.  Trustee's decision to bring two Motions for Turnover against the Debtor is only discussed to place in context the actions and inactions of the Defendants, their counsel and Debtor that made filing of the adversary proceeding necessary. Debtor, however, has made no attempt to distinguish between the two Motions for Turnover brought by Trustee against Debtor and the Complaint for Turnover brought by the Firm against Debtor's siblings.  In fact, Debtor did not mention the adversary proceeding in his briefs.  To be clear, Trustee in his capacity as Trustee, brought two Motions for Turnover against Debtor.  Trustee did not hire the Firm as counsel for either Turnover Motion nor has the Firm claimed any fees for bringing the Turnover Motions.  The Firm was hired to bring the adversary proceeding against the Defendants.  As such, the Firm is requesting compensation for that action alone.

[51] "[O]nce the bankruptcy court has approved a rate or means of payment, such as a contingent fee, the court cannot on the submission of the final fee application instead approve a 'reasonable' fee under sect. 330(a), unless the bankruptcy court finds that the original arrangement was improvident due to unanticipated circumstances as required by sect. 328(a)." *In re Tex. Sec. Inc.*, 218 F.3d 443, 445-46 (5th Cir. 2000).

In the Firm's re-urged Employment Application, it requested compensation based on a one-third (1/3) contingency of all amounts obtained. Because the Court is only now reconsidering the methodology of the Firm's compensation, it is not bound by the terms of the original approval and may, with the benefit of hindsight, approve the fee on a contingency or hourly basis.

With the benefit of hindsight, this Court elects to compensate the Firm on an hourly basis. The estate is now liquid, the Firm is now assured of payment, the value of the estate is determined and the amount necessary to satisfy claims calculable. Hourly fee arrangements are common and preferred because they can be adjusted based on the factors set forth in *Johnson v. Georgia Hwy Exp., Inc.*[52] ("the Johnson Factors").

The Johnson Factors

1. Time Expended. The Firm expended 55.5 hours in the prosecution of the Complaint against Debtor's siblings, including discovery propounded in the context of that adversary proceeding.[53] The Firm had to review and analyze the purported Donation, research the law applicable thereto and, after negotiating a settlement and obtaining approval thereof, draft real estate and other legal documents necessary to conclude same. Records for time expended by the Firm do not contain any overlap between the time expended by Trustee in connection with his administrative duties and the time expended by the Firm in pursing the adversary proceeding. In addition, the Firm introduced time sheet summaries reflecting 41.10 additional hours expended in bringing the Employment Application and Application for Compensation to a decision.[54] That exhibit, however,

---

[52] *Johnson v. Georgia Hwy Exp., Inc.*, 488 F.2d 714, 717-20 (5th Cir. 1974).

[53] Exhibit 15.

[54] While the invoice dated July 7, 2009, reflects 67.60 hours, the Firm reduced the time claimed to 41.10 hours. The reduction was to reflect time spent in pursuing the Fifth Circuit appeal.

does not include any billable time beyond July 7, 2009.  In other words, Exhibit 16 did not include

time expended at the trial of this matter.  The total amount of time spent by the Firm on this case prior

to the trial, less time spent preparing briefs to the Fifth Circuit, equals 96.6 hours, which translates

into an hourly bill of $24,150.00.[55]  The Firm has voluntarily reduced its request for compensation

to an amount sufficient to satisfy all creditors in full.  Based on the Court's calculations, this results

in a request for $20,897.21.   The Court considers this reasonable in light of the litigation  and time

expended in this matter.

2.      Expertise.  The successful resolution of the adversary proceeding required experience

in bankruptcy law, as well as the Louisiana law of successions, donations, revocatory actions and

agency.  The Firm has extensive experience in all areas of the law involved.

3.      Complexity.  The issues involved in the prosecution of the adversary proceeding have

been outlined in detail in these Reasons and will not be repeated here.  The multitude of issues

presented  by the facts made this case fairly complex, particularly in light of the limited information

initially available to Trustee.  Following conclusion of the adversary proceeding, the Firm was

required to defend its Employment and Compensation Applications on appeal and ultimately, at a

new trial. The effort expended by the Firm to present and defend its Applications is compensable.[56]

4.      Results Obtained.  As a result of the Firm's efforts, Trustee recovered $75,000.00 in

cash for the bankruptcy estate.   Unsecured claims in this case total $49,876.97 after the first

distribution is applied.  Administrative expenses equal $34,386.95.  The funds received in settlement

---

[55]Although an updated invoice was not attached, the Firm opined in the Post-Trial Brief that it spent an additional twenty (20) hours beyond July 7, 2009.  Twenty (20) hours would translate into an additional invoice of $5,000.00 in fees.  The Court does not need to accept the late filed evidence because it is not necessary to determining the amount of compensation.

[56]*In re Braswell Motor Freight Lines, Inc.*, 630 F.2d 348, 351 (5th Cir. 1980).

23

were nearly sufficient to satisfy all claims in full, depending on the amount awarded the Firm.  This is an outstanding result on an estate that was initially believed to be wholly insolvent.

5.      <u>Preclusion of Other Work</u>.  The Firm did not claim that its employment precluded the performance of other legal work.

6.      <u>Undesirability of Work.</u>  The Firm did not claim that the work was undesirable.  However, the lack of assets with which to assure payment made the retention in this case less than optimal.

7.      <u>Relationship to Client.</u>  Trustee is a member of the Firm.

Given the Johnson Factors, the Court approves a fee of $20,897.21 with $129.40 in reimbursable costs.  Although the Court declined to award a fee based on a contingency, the fee awarded is actually less than the amounts that would have been paid under the Court's original authorization.

## CONCLUSION

The Court finds that the Trustee's employment of legal counsel to institute an adversary proceeding against the Debtor's siblings was warranted and necessary.  It also finds that employment of Healy & Smith , APLC was in the best interests of the estate pursuant to 11 U.S.C. §327(d).  For the reasons set forth in these Reasons, the Court awards the fee of $20,897.21, along with costs of $129.40, to Healy & Smith , APLC.   An Order in accord with these Reasons will be rendered separately.

New Orleans, Louisiana, December 30, 2009.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge